IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ROBERT J. CHRISTENSEN,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF KAUAI; REBECCA VOGT-LIKE,<br><br>Defendants. | Civ. No. 23-00001 JMS-KJM<br><br>ORDER GRANTING IN PART AND DENYING IN PART THE COUNTY OF KAUAI'S MOTIONS FOR PARTIAL JUDGMENT ON THE PLEADINGS, ECF NOS. 71, 72, 73, AND REBECCA VOGT-LIKE'S SUBSTANTIVE JOINDERS, ECF NOS. 74, 75, 76 |

## ORDER GRANTING IN PART AND DENYING IN PART THE COUNTY OF KAUAI'S MOTIONS FOR PARTIAL JUDGMENT ON THE PLEADINGS, ECF NOS. 71, 72, 73, AND REBECCA VOGT-LIKE'S SUBSTANTIVE JOINDERS, ECF NOS. 74, 75, 76

## I. INTRODUCTION

Plaintiff Robert J. Christensen ("Plaintiff") claims he was wrongfully terminated from his job as a deputy prosecutor for the County of Kauai in violation of his constitutional rights under the First Amendment, the Hawaii Whistleblowers' Protection Act ("HWPA"), and various state tort laws.  ECF No. 17.  Defendant County of Kauai ("the County") filed three motions for judgment on the pleadings, seeking to dismiss Plaintiff's claims for (1) intentional infliction of emotional distress ("IIED") (ECF No. 71); (2) due process, HWPA, and wrongful termination (ECF No. 72); and (3) First Amendment retaliation (ECF No.

73).  Defendant Rebecca Vogt-Like ("Like") filed substantive joinders in all three

motions, adding arguments particular to her.  ECF Nos. 74, 75 & 76.

For the reasons to follow, the court:

(1)     GRANTS judgment on the pleadings and dismisses Plaintiff's IIED

claim as to the County, but DENIES dismissal of the same as to Like;

(2)     GRANTS judgment on the pleadings and dismisses Plaintiff's due

process claims as to both Defendants, and further GRANTS dismissal of Plaintiff's

HWPA claim as to Like;

(3)     DENIES judgment on the pleadings as to Plaintiff's First Amendment

retaliation claim and, determining that Like has qualified immunity, GRANTS

dismissal of the same as to Like.

## II.  BACKGROUND

### A.     Factual Background[1]

Plaintiff worked as a deputy prosecutor at the Kauai Office of the

Prosecuting Attorney ("OPA") from December 1, 2021, until his termination on

June 21, 2022.  ECF No. 17 at PageID.102, 120.  During this period, Like was the

---

[1]  In analyzing the motions, the court takes all well-pleaded allegations of the Second Amended Complaint ("SAC") as true.  *See, e.g.*, *Knappenberger v. City of Phoenix*, 566 F.3d 936, 939 (9th Cir. 2009) (citation omitted).

Prosecuting Attorney for the County of Kauai.[2]  Plaintiff alleges that during the course of working on an assault case, he learned that the suspect's counsel ("Suspect's Counsel") had engaged in what Plaintiff believed was witness tampering.  *Id.* at PageID.103–104.  Suspect's Counsel had "pressured [the complaining witness] to 'withdraw' and 'resolve' the case" and had "orchestrated the [complaining witness's] creation of" a handwritten letter that contained multiple misrepresentations.  *Id.* at PageID.103–104.  Plaintiff notified his superiors, Deputy Prosecuting Attorneys ("DPAs") Keola Siu and Leon Davenport, of his concerns that Suspect's Counsel had engaged in witness tampering and/or intimidation.  *Id.* at PageID.104.  They encouraged him to continue investigating Suspect's Counsel.  *Id.* at PageID.104–105.

On April 26, 2022, six nominations were announced for a vacant State of Hawaii District Court judge position on Kauai.  *Id.* at PageID.105.  The nominees included Suspect's Counsel and DPA Siu.  *Id.*  Plaintiff used his personal email to submit comments to the Chief Justice of the Hawaii Supreme Court

---

[2]  That Like was the Prosecuting Attorney for the County of Kauai at the time of the events in question is common knowledge and not disputed.  Plaintiff does not explicitly state Like's position and title in the SAC, but it refers to Like as "Prosecuting Attorney Like" and alleges that Plaintiff was in her employ.  ECF No. 17 at PageID.101, 120.

regarding the nominees,[3] informing him that OPA was currently investigating Suspect's Counsel's alleged witness tampering.  *Id.*  Plaintiff also informed the OPA chain of command of his comments to the Chief Justice.  *Id.* at PageID.105–106.  On June 2, 2022, Plaintiff used his personal email to submit comments to the Hawaii State Bar Association ("HSBA")[4] about Suspect's Counsel, identical to those he had submitted to the Chief Justice.  *Id.* at PageID.106.

The SAC alleges that, on June 3, 2022, Plaintiff interviewed the complaining witness in the assault case, who confirmed that Suspect's Counsel had "ghost writ[ten]" the letter that was handwritten by the complaining witness, and that Suspect's Counsel had told the complaining witness to contact Plaintiff and withdraw his complaint.  *Id.* at PageID.106–107.  Plaintiff recorded this interview and played it for DPA Davenport and DPA Tyler Saito, and both agreed that Suspect's Counsel engaged in witness tampering.  *Id.* at PageID.107–108.  Plaintiff told them he would file a police report on behalf of the OPA, file an Office of

_____

[3]  The State of Hawaii Constitution, Article VI, section 3, provides that the "chief justice, with the consent of the senate, shall fill a vacancy in the district courts from a list of not less than six nominees for the vacancy presented by the judicial selection commission."

[4]  "The [HSBA] Board shall evaluate the qualifications of persons appointed to judicial office in Hawaii . . . and inform the confirming authority of such recommendations and evaluations."  Hawaii State Bar Association, Constitution and Bylaws, Article IX (October 14, 2022), https://hsba.org/images/hsba/HSBA/HSBA%20Constitution%20and%20Bylaws.pdf [https://perma.cc/GPZ4-4SFR].

Disciplinary Counsel ("ODC")[5] complaint against Suspect's Counsel, and testify before the HSBA Board and Hawaii State Senate Judiciary Committee against Suspect Counsel's appointment as a judge.  DPA Davenport agreed with Plaintiff's course of action and told him he was proud of his work.  *Id.* at PageID.108.  When Plaintiff informed DPA Siu of his plans, Siu asked Plaintiff "not to do it for me." *Id* at PageID.109.  Plaintiff stated he did not need Siu's permission and that he was "not doing it for you I am doing it for everyone."  *Id.*  Plaintiff then informed Like of his plans and she offered "full support."  *Id.*

On June 8, 2022, Plaintiff filed a police report against Suspect's Counsel for witness tampering.  *Id.* at PageID.110.  Plaintiff submitted a complaint to the ODC on June 13, 2022, which Plaintiff alleges was undertaken in his personal capacity and at his personal expense.  *Id.*  On June 14, 2022, Plaintiff took a personal leave (which was approved by Siu) and testified before the HSBA Board via Zoom.  *Id.* at PageID.110–111.  The HSBA Board asked permission to contact DPA Siu and DPA Davenport.  Davenport agreed to speak with them, but Siu stated that he wanted nothing further to do with Suspect's Counsel because "it would come back on him."  *Id.* at PageID.111–112.

---

[5]  The ODC, formed by the Hawaii Supreme Court, investigates complaints against Hawaii lawyers as part of the Disciplinary Board of the Hawaii Supreme Court.  *See* Hawaii State Judiciary, Office of Disciplinary Counsel (2024), https://www.courts.state.hi.us/legal_references/attorneys/hlffcp/office_of_disciplinary_counsel [https://perma.cc/4YYG-8NAZ].

On June 15, 2022, Plaintiff submitted testimony against the nomination of Suspect's Counsel to the State of Hawaii Senate "on OPA letterhead in his own capacity." *Id.* at PageID.112. Plaintiff gave Like a copy. *Id.* This testimony was read into the Senate record. *Id.* At 8:30 a.m. on June 17, 2022, Plaintiff spoke to Like by phone and told her that Senator Rhoads'[6] office was contacting him for further information. *Id.* at PageID.112–113. Like told Plaintiff that she was in full support of all Plaintiff's actions and that he was "doing the right thing." *Id.* at PageID.113.

Then, at 12:39 p.m. that same day, Like texted Plaintiff and told him that she was going to "walk back" Plaintiff's testimony regarding Suspect's Counsel. *Id.* at PageID.114. Like told Plaintiff that OPA would not take an official position on the confirmation because Suspect's Counsel would be "confirmed anyway," and that there would be no criminal investigation in response to the police report Plaintiff had filed. *Id.* She stated that she was not comfortable with the OPA opposing the confirmation based on an investigation that was ongoing and incomplete, and that she was concerned about liability for the OPA. *Id.* She told him to take the rest of the day off. *Id.* at PageID.115.

---

[6] In 2022, Senator Karl Rhoads served as chair of the Hawaii State Senate Committee on the Judiciary, the Senate committee responsible for the consideration of judicial nominations. *See* Hawaii State Legislature, Senate Committee on Judiciary – Archive Page (2022), https://www.capitol.hawaii.gov/legislature/committeepage.aspx?comm=JDC&year=2022.

Two days later, on Sunday, June 19, 2022, Like emailed Plaintiff and told him that he was being placed on administrative leave with pay pending an internal investigation. *Id.* Plaintiff retained counsel to represent him. *Id.* at PageID.116. The basis for the internal investigation, which Plaintiff received from Like by email on June 20, 2022, was that

> (1) [plaintiff] did not receive permission to submit testimony to the Senate Judiciary Committee and the Office of Disciplinary Counsel on official County of Kauai, Office of the Prosecuting Attorney letterhead; and (2) the investigation is to understand [plaintiff's] efforts to seek input and approval from [his] supervisors on the aforementioned actions prior to our initial conversation regarding this investigation on June 6, 2022.

*Id.*

The email requested Plaintiff's presence at an interview at 9:00 a.m. the following morning, at which Like and OPA Human Resources Representative Yvette Sahut would be present. *Id.* at PageID.116–117.

Upon meeting Like and Sahut on June 21, 2022, Plaintiff requested the interview be rescheduled to a time when his counsel could be present. *Id.* at PageID.117. Like and Sahut refused and said that the investigation would be completed that day. *Id.* Plaintiff also asked about his "rights, duties, and obligations" in reference to the internal investigation and asked what authority had authorized it, but he did not receive answers. *Id.* Sahut became angry and asked

7

whether Plaintiff was going to cooperate with the investigation.  *Id.*  Plaintiff said

he would cooperate but reiterated his question about his rights.  *Id.*  He asked that

the interview be recorded.  *Id.* at PageID.118.  The request was denied.  *Id.*

Plaintiff asked Like and Sahut for patience because his anxiety disorder was

"starting to overwhelm him."  *Id.*  He asked again about his "rights, duties, and

obligations," reiterated that he was willing to cooperate, and stated that he wanted

his counsel present.  *Id.* at PageID.119.

Like did not answer Plaintiff's questions, and instead told Plaintiff

that she felt he no longer wanted to work as a DPA at the OPA.  *Id.*  Plaintiff

responded that he "loved working there."  *Id.*  At 12:47 p.m. that day, Like sent

Plaintiff an email notice of termination, giving no reason.  *Id.* at PageID.120.

Plaintiff further alleges that at some point Defendants made

statements that he "was terminated due to his renegade performance" and that he

"had inappropriately taken an office position on a public matter."  *Id.* at

PageID.126.  Defendant allegedly made these statements "internally and by issuing

statements to the press."  *Id.*

## B.    Procedural History

Plaintiff filed his SAC on March 10, 2023.  ECF No. 17.  The County

filed its three Motions for Partial Judgment on the Pleadings on June 18, 2024.  *See*

ECF Nos. 71 (Infliction of Emotional Distress), 72 (HWPA and Wrongful

Termination), & 73 (First Amendment Retaliation).  Like filed her Substantive

Joinders on June 20, 2024.  ECF Nos. 74, 75, & 76.  Plaintiff filed his Oppositions

on July 29, 2024.  ECF Nos. 80, 81, & 82.  The County filed Replies on August 5,

2024.  ECF Nos. 83, 84, & 85.  A hearing was held on August 19, 2024.  ECF No.

87.

### III.  <u>STANDARD OF REVIEW</u>

A motion for judgment on the pleadings under Federal Rule of Civil

Procedure 12(c) is a means to challenge the sufficiency of the complaint after an

answer has been filed.  *See, e.g.*, *Rohm v. Homer*, 367 F. Supp. 2d 1278, 1281

(N.D. Cal. 2005) (quotation marks and citation omitted).  A party may make a

motion for judgment on the pleadings at any time after the pleadings are closed,

but within such time as to not delay the trial.  Fed. R. Civ. P. 12(c).  Because the

issue presented by a Rule 12(c) motion is substantially the same as that posed in a

12(b)(6) motion—whether the factual allegations of the complaint, together with

all reasonable inferences, state a plausible claim for relief—the same standard

applies to both.  *See Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1054 &

n.4 (9th Cir. 2011); *see also Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188,

1192 (9th Cir. 1989) (holding that Rule 12(c) and Rule 12(b)(6) motions differ in

time of filing but are otherwise "functionally identical," and applying the same standard of review).

A Rule 12(b)(6) dismissal is proper when there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting *Balistreri v. Pacific Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008). This tenet—that the court must accept as true all of the allegations contained in the complaint—"is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable interference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Factual allegations that only permit the court to infer

"the mere possibility of misconduct" do not show that the pleader is entitled to relief. *Id.* at 679.

A motion for judgment on the pleadings is properly granted when there are no disputed issues of material fact, and the moving party is entitled to judgment as a matter of law. *See Ventress v. Japan Airlines*, 603 F.3d 676, 681 (9th Cir. 2010) (citation omitted). Judgment on the pleadings is not appropriate if the court considers matters outside of the pleadings; in such cases, the motion must be converted to a Rule 56 motion for summary judgment, and the non-moving party must be granted an opportunity to respond. *See* Fed. R. Civ. P. 12(d); *Hal Roach Studios, Inc., v. Richard Feiner & Co.,* 896 F.2d 1542, 1550 & n.14 (9th Cir. 1989). The court may, however, "consider certain materials—documents attached to the complaint, documents incorporated by reference into the complaint, or matters of judicial notice—without converting the motion . . . into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

## IV.  **DISCUSSION**

**A.     Motions for Judgment on the Pleadings as to Plaintiff's Intentional Infliction of Emotional Distress Claim (ECF Nos. 71 & 74)**

The basis of Plaintiff's IIED claim appears to be his termination generally, and the derogatory comments that Defendants made about the circumstances of his termination sometime afterward. *See* ECF No. 17 at

11

PageID.127–128 (alleging that he was "terminated . . . in violation of a

fundamental public policy" and that "Defendants' . . . conduct in maliciously

defaming Plaintiff" caused him damage).  Plaintiff alleges that in addition to

terminating him, Defendants also stated "internally and . . . to the press" that he

"had inappropriately taken an office position on a public matter" and that he "was

terminated due to his renegade performance."  *Id*. at PageID.126.  He alleges that

the misconduct was wilful and wanton.  *Id.* at PageID.128 ("The actions of

Defendants as stated herein constituted negligent and / or intentional and / or

willful and wanton misconduct which caused Plaintiff physical injury, mental and

emotional distress.").[7]

   The County argues that Plaintiff's IIED claim should be dismissed for

two reasons:  First, Plaintiff has not sufficiently established outrageousness, one

element of the IIED tort; and second, the claim is barred by the Hawaii Workers'

Compensation Law ("WCL").  ECF No. 71-1 at PageID.343–358.  Like joins both

of these arguments, and further argues that Plaintiff has not adequately pled "wilful

and wanton" misconduct by Like.  ECF No. 74-1 at PageID.443–451.  Because

Like and Plaintiff are both employees of the same employer (the County) under

---

[7] Plaintiff conceded at the hearing that he was not making a negligent infliction of
emotional distress claim.

Hawaii Revised Statutes ("HRS") § 386-8(k), the WCL bars Plaintiff's claim against Like unless he plausibly alleges that she engaged in "wilful and wanton misconduct."

The court concludes that Plaintiff's IIED claim against the County is barred by the WCL to the extent it arises out of conduct up to and including termination.  Plaintiff's IIED claim post-termination is not barred by the WCL, but as pled does not meet the IIED standard for outrageousness.  Plaintiff's claim against Like is not barred by the WCL because Plaintiff has plausibly alleged "wilful and wanton misconduct" by Like that is outrageous.

### 1.   *Hawaii Law on IIED*

#### a.   *Generally*

"Under Hawaii law, the elements of IIED are '(1) that the act allegedly causing the harm was intentional or reckless, (2) that the act was outrageous, and (3) that the act caused (4) extreme emotional distress to another.'" *Cornel v. Hawaii*, 501 F. Supp. 3d 927, 946 (D. Haw. 2020), *aff'd*, 37 F.4th 527 (9th Cir. 2022) (citing *Enoka v. AIG Haw. Ins. Co.*, 109 Haw. 537, 559, 128 P.3d 850, 872 (2006)).

"The term 'outrageous' has been construed to mean 'without just cause or excuse and beyond all bounds of decency.'" *Enoka*, 109 Haw. at 559, 128

13

P.3d at 872 (quoting *Lee v. Aiu*, 85 Haw. 19, 34 n.12, 936 P.2d 655, 670 n.12

(1997)).  The Hawaii Supreme Court follows the Restatement (Second) of Torts on

outrageousness:

> It has not been enough that the defendant has acted with
> an intent which is tortious or even criminal, or that he has
> intended to inflict emotional distress, or even that his
> conduct has been characterized by "malice," or a degree
> of aggravation which would entitle the plaintiff to
> punitive damages for another tort.  Liability has been
> found only where the conduct has been so outrageous in
> character, and so extreme in degree, as to go beyond all
> bounds of decency, and to be regarded as atrocious, and
> utterly intolerable in a civilized community.  Generally,
> the case is one in which the recitation of the facts to an
> average member of the community would arouse his
> resentment against the actor, and lead him to exclaim,
> "Outrageous!"

*Ross v. Stouffer Hotel Co. (Hawaiʻi) Ltd.*, 76 Haw. 454, 465 n.12, 879 P.2d 1037,

1048 n.12 (1994).  "The question whether the actions of the alleged tortfeasor

are . . . outrageous is for the court in the first instance, although where reasonable

persons may differ on that question it should be left to the jury."  *Shoppe v. Gucci*

*Am., Inc.*, 94 Haw. 368, 387, 14 P.3d 1049, 1068 (2000) (internal quotation marks

and citations omitted).

> b.    *IIED and Hawaii Workers' Compensation Law*

Hawaii law provides that the WCL is the exclusive remedy for work

injuries:

> The rights and remedies herein granted to an employee or
> the employee's dependents on account of a work injury
> suffered by the employee shall exclude all other liability
> of the employer to the employee, the employee's legal
> representative, spouse, dependents, next of kin, or anyone
> else entitled to recover damages from the employer, at
> common law or otherwise, on account of the injury,
> except for sexual harassment or sexual assault and
> infliction of emotional distress or invasion of privacy
> related thereto, in which case a civil action may also be
> brought.

HRS § 386–5.

As a result, IIED claims arising out of plaintiff's employment are, for

the most part, barred by the WCL.  "Hawaii courts and federal courts applying

Hawaii law have held time and again that the exclusivity provision of [the WCL]

bars IIED claims, unless those claims relate to sexual harassment or sexual

assault."  *Kuehu v. United Airlines, Inc.*, 2016 WL 4445743, at \*8 (D. Haw. Aug.

23, 2016); *see also Machorek v. Marriott Ownership Resorts, Inc.*, 2016 WL

6963029, at \*8 (D. Haw. Nov. 28, 2016) (finding that IIED claims are barred by

HRS § 386-5 unless related to sexual assault, sexual harassment, or sexual

discrimination).  *But see Furukawa v. Honolulu Zoological Soc'y*, 85 Haw. 7, 18,

936 P.2d 643, 654 (1997) (holding that WCL's exclusivity provision does not

apply where "intentional conduct" of an employer resulted in discrimination);

*Yang v. Abercrombie & Fitch Stores,* 128 Haw. 173, 177, 182–83, 284 P.3d 946,

15

950, 955–56 (Haw. Ct. App. 2012) (clarifying that in *Furukawa* the Hawaii Supreme Court only created a judicial exception to the WCL for discrimination, not for all intentional torts).

### 2. *Plaintiff's IIED Claim Against the County Is Barred as to Conduct Up to and Including Plaintiff's Termination*

Plaintiff alleges an IIED claim arising from the County and Like's conduct before, during, and after termination. The first part of his claim arises out of his termination generally, which encompasses all of Defendants' conduct up to and including his receipt of his notice of termination on June 21, 2022. The second part arises from statements made post-termination.

To the extent Plaintiff's IIED claims against the County arise out of the County's conduct during the course of his employment, up to and including his termination, they are barred by the WCL. Prior to his termination, Plaintiff was an employee of the County and was therefore covered by the WCL. Emotional distress suffered by Plaintiff from the County's conduct while it was his employer would fall under HRS § 386-3, which explains that the WCL covers "personal injury . . . by accident arising out of and in the course of the employment." As a result, the WCL provides the exclusive remedy for any infliction of emotional distress up to and including the time of termination.

Plaintiff argues that his claims are not barred under *Nakamoto v. Kawauchi*, 142 Haw. 259, 269, 271–72, 418 P.3d 600, 610, 612–13 (2018). *Nakamoto* held that defamation and false light claims are not barred by the WCL because injuries to reputation are not "personal injury," as defined in HRS § 386–3. *Id.* The court held that "[g]eneral damages [for a defamation claim] includes compensation for 'impairment of reputation and standing in the community,' and 'personal humiliation, and *mental anguish and suffering.*'" 142 Haw. at 271, 418 P.3d at 612 (emphasis added). Plaintiff claims that because *Nakamoto* explicitly allows damages to be recovered for "mental anguish and suffering" as a result of defamation, his IIED claim—which is based on "conduct of defendants [that] defamed him"—is therefore not barred by the exclusivity provision.[8] ECF No. 80 at PageID.495.

Plaintiff is incorrect. *Nakamoto* held that the plaintiff was free to pursue his *defamation* claim, and to obtain damages for mental anguish—but said nothing about an IIED cause of action. In other words, *Nakamoto*'s holding that *damages* are available for mental anguish caused by defamation does not mean that a *cause of action* for mental anguish (i.e., IIED) is available. As explained above,

---

[8] To be clear, Plaintiff argues that *Nakamoto* invalidates the County's argument that the WCL precludes claims based on *any of* Defendants' conduct, not just the alleged defamatory statements post-termination. *See* ECF No. 80 at PageID.495.

courts have held that IIED falls squarely within the WCL exclusivity provision in HRS § 386–5.  Thus, Plaintiff's IIED claim is barred as to all conduct up to and including termination.

### 3.   *Plaintiff's IIED Claim Against the County Based on Post-Termination Conduct Is Not Barred by the WCL but the Conduct Alleged Is Not Outrageous*

Plaintiff's defamation-based IIED claim against the County arising out of defamatory statements made after termination is not barred by the WCL.  In *Nakamoto v. Kawauchi*—the underlying opinion that was reversed in part by the Hawaii Supreme Court, as discussed above—the Intermediate Court of Appeals held that an IIED claim arising out of post-termination defamatory statements was not barred by the WCL because "[t]he essential prerequisite for coverage under Hawaii's Workers' Compensation Law is the existence of an employer-employee relationship."  *Nakamoto v. Kawauchi,* 2017 WL 986008, at *6 (Haw. App. 2017) (quoting *Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 644, 636 P.2d 721, 723 (1981)).  The Hawaii Supreme Court did not reach that issue—having reversed the ICA on appeal and held that defamation claims were not covered by the exclusivity provision at all, there was no need to do so.  *Nakamoto*, 142 Haw. at 271–72, 418 P.3d at 612–13.

Nevertheless, the ICA's reasoning in *Nakamoto* is sound and this court believes that the Hawaii Supreme Court would follow the same course.[9] Upon termination there is no longer an employer-employee relationship, so there is no coverage under the WCL.  2017 WL 986008, at *7; *see also* HRS §§ 386-1, 386-3.

The IIED claim nonetheless warrants dismissal because as currently alleged, it does not meet the standard for "outrageousness."  The County's alleged

---

[9] Defendants' argument to the contrary is unpersuasive.  They cite a district court decision predating both *Nakamoto* decisions, in which the court determined that a post-termination defamation claim was barred by the WCL.  *Hillhouse v. Hawaii Behav. Health, LLC*, 2014 WL 5528239, at *8 (D. Haw. Oct. 31, 2014).  That court reasoned that the Hawaii Supreme Court had adopted a "unitary test" for worker's compensation coverage—that is, if there is "a causal connection between the injury and any incidents of employment" it is covered by WCL. *Id.*  Applying the unitary test, the court ruled that because there was a causal connection between post-termination defamation and incidents of employment, the WCL applied and barred the claims.  *Id.*

This court finds the ICA ruling in *Nakamoto* more persuasive.  *Hillhouse* appears to be an outlier in its temporal application of the unitary test.  In fact, *Hough v. Pacific Insurance Co.*, the Hawaii Supreme Court case that *Hillhouse* relies on in its discussion of the unitary test, does not use that test to determine *when* an injury must happen to be covered by WCL—it uses the test to determine *what* injuries are covered by WCL.  *See Hough v. Pac. Ins. Co.*, 83 Haw. 457, 465, 927 P.2d 858, 866 (1996) (concluding that "emotional and physical suffering allegedly caused by an insurer's [denial of medical benefits]" does not arise out of the course of employment and is not covered by WCL).  *Hough* also appears to contradict *Hillhouse*'s application of the unitary test—it held that "[a]n injury is said to arise in the course of the employment when it takes place *within the period of employment*," indicating that a post-termination injury would not be covered.  *Hough*, 83 Haw. at 465, 927 P.2d at 866 (emphasis added) (quoting *Tate v. GTE Hawaiian Telephone Co.,* 77 Haw. 100, 103–04, 881 P.2d 1246, 1249–50 (1994)).  In short, this court declines to follow *Hillhouse* on this point, and determines that the post-termination conduct in this case is not covered by the WCL.

statements that Plaintiff was terminated for a "renegade performance" or because he "inappropriately [took] an office position on a public matter" may be false and malicious as Plaintiff alleges—but even a "tortious or . . . criminal intent" to inflict emotional distress has not been enough to meet the outrageousness standard. *Ross*, 76 Haw. at 465 n.12, 879 P.2d at 1048 n.12.  These statements are not "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency." *Id.*  These claims are therefore also DISMISSED.  Plaintiff is granted leave to amend his Complaint if he believes he can allege post-termination conduct that satisfies the IIED standard.

### 4.     *Plaintiff's IIED Claim Against Like Survives*

Plaintiff has alleged a plausible IIED claim against Like.  First, the claim against Like is not barred by the WCL.  Under HRS § 386-8(k), "[a]nother employee of the same employer shall not be relieved of that employee's liability [under the WCL] as a third party, if the personal injury is caused by that employee's wilful and wanton misconduct." *See also Iddings v. Mee-Lee*, 82 Haw. 1, 12, 919 P.2d 263, 274 (1996) ("'[W]ilful and wanton misconduct,' as used in HRS § 386–8, includes conduct that is either: (1) motivated by an actual intent to cause injury; or (2) committed in circumstances indicating that the injuring employee (a) has knowledge of the peril to be apprehended, (b) has knowledge that

the injury is a probable, as opposed to a possible, result of the danger, and (c) consciously fails to avoid the peril."). Here, Plaintiff and Like were both employees of the County of Kauai.

Second, Plaintiff has plausibly alleged that Like engaged in outrageous conduct that is "wilful and wanton" because she was "motivated by an actual intent to cause injury." *Id.* Plaintiff alleges that at 8:30 a.m. on June 17, 2022, Plaintiff spoke to Like by phone and told her that Senator Rhoads' office was contacting him for further information. ECF No. 17 at PageID.112–13. Like told Plaintiff that she was in full support of all Plaintiff's actions and that he was "doing the right thing." *Id.* at PageID.113. Then, at 12:39 p.m. that same day, Like allegedly texted Plaintiff and entirely retracted her support, stating that she was going to "walk back" Plaintiff's testimony regarding Suspect's Counsel, that OPA would not take an official position, that she was not comfortable with the OPA opposing the confirmation based on an investigation that was ongoing and incomplete, and that she was concerned about liability for the OPA. *Id.* at PageID.114. She then told him to take the rest of the day off and initiated an investigation into his conduct resulting in his termination—all despite having fully supported and approved of Plaintiff's actions just a few hours earlier. *Id.* at PageID.115.

21

A plausible implication from this series of alleged events is that Like made Plaintiff into a scapegoat:  She needed to distance herself (and the OPA) from Plaintiff's testimony, so she terminated Plaintiff and asserted that he had gone rogue in submitting the testimony in the first place.  It was not enough for the OPA to simply stop investigating Suspect's Counsel—Like needed someone to blame, and thus terminated Plaintiff through no fault or failure of his own.  This alleged conduct, which the court must treat as true in ruling on the instant motion, plausibly rises to the level of misconduct that is "wilful and wanton" and outrageous.

Defendants' Motion is therefore DENIED as to Plaintiff's IIED claim against Like.

**B.   Motions for Judgment on the Pleadings as to Plaintiff's Due Process, Hawaii Whistleblower Protection Act, and Wrongful Termination Claims (ECF Nos. 72 & 76)**

*1.   The Claims at Issue*

These motions concern Count II, "Wrongful Termination in Violation of Public Policy, HRS § 378-62" and Count III, "Violation of Due Process."  ECF No. 17 at PageID.124–125.  Count II contains two claims.  It alleges, first, a

22

violation of the HWPA, and second, a claim based on *Parnar v. Americana Hotels, Inc.,* 65 Haw. 370, 380, 652 P.2d 625, 631 (1982).[10]  *Id.*

      The County initially sought dismissal of the HWPA, *Parnar*, and due process claims, but withdrew its argument as to the HWPA and *Parnar* claims, leaving only the due process claim.[11]  Like joins the County's due process argument, and additionally argues that the HWPA claim must be dismissed as to her because an HWPA claim cannot be brought against an individual.  ECF No. 76-1 at PageID.471.  Thus, the only claim still at issue as to the County is the due process claim, and the only claims at issue as to Like are the due process and HWPA claims.

      As set forth below, Plaintiff has not plausibly alleged a due process claim against the County or Like.  Furthermore, because an HWPA claim cannot

---

[10]  A *Parnar* claim is a common law cause of action for at-will employees wrongfully terminated in violation of public policy.  *See Juntonnen v. Rehabilitation Hospital of the Pac.*, 2018 WL 3078744, at *4 (D. Haw. June 21, 2018) (citing *Parnar,* 65 Haw. at 380, 652 P.2d at 631).  Plaintiff confirmed at the hearing that Count II was intended to encompass both a *Parnar* and an HWPA claim.

[11]  The County withdrew its motion as to the HWPA claim in its Reply, ECF No. 84 at PageID.570, and Plaintiff clarified at the hearing that his *Parnar* claim is entirely premised on the alleged violation of HWPA by the County and Like.  Thus, because the County no longer seeks dismissal of the HWPA claim, both the HWPA and *Parnar* claims remain in the case as to the County.  Hawaii law allows both a common law *Parnar* claim and a statutory HWPA claim. *See, e.g.*, *Griffin v. JTSI, Inc.*, 654 F. Supp. 2d 1122, 1141 (D. Haw. 2008) ("Given the clear legislative intent, Plaintiffs may properly raise their *Parnar* claim for wrongful termination in violation of public policy, even when that public policy is whistleblower protection under the HWPA.") (citation omitted).

be brought against an individual, Plaintiff's HWPA claim must be dismissed against Like.

> **2.    Plaintiff's Stigma-Plus Due Process Claim Fails Against the County and Against Like**

Count III does not specify what type of due process claim is being alleged.  ECF No. 17 at PageID.124.  In its motion, the County presumed that Plaintiff is attempting to assert three different due process claims: "(1) a substantive due process claim, (2) a stigma-plus due process claim (i.e. a type of procedural due process claim based on violation of a protected liberty interest), and (3) a procedural due process claim based on violation of a protected property interest."  ECF No. 72-1 at PageID.378–379.  In his opposition, Plaintiff defended only a stigma-plus claim.  ECF No. 81 at PageID.521–523.[12]  That is the sole claim the court addresses.

---

[12]    At the hearing, Plaintiff argued that his opposition addressed a procedural due process claim in addition to a stigma-plus claim.  But a plain reading of Plaintiff's opposition shows otherwise.  For example, Plaintiff claims that his citation to *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002), is evidence of his intent to raise a procedural due process claim.  *See* ECF No. 81 at PageID.522–523.  But the citations to *Ulrich* concern a stigma-plus, not procedural, due process claim.  Given his failure to raise a procedural due process claim in his opposition, the court will not consider it.  *See Caralho v. Equifax Info Servs., LLC*, 629 F.3d 876, 888 (9th Cir. 2010) ("A plaintiff who makes a claim in his complaint, but fails to raise the issue in response to a defendant's motion to dismiss has effectively abandoned his claim, and cannot raise it on appeal.") (citation and alterations omitted); *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 681 (9th Cir. 2018) (same) (citing *Carvalho*, 629 F.3d at 888).  That is, even if the SAC could be construed as raising a procedural due process claim (or any other type of due process claim), Plaintiff has abandoned those claims by failing to oppose the motion.

A due process claim must be based on more than simply injury to reputation:  "[O]ne's interest in reputation standing alone is neither liberty nor property guaranteed against [government] deprivation without due process of law." *Wenger v. Monroe,* 282 F.3d 1068, 1074 (9th Cir. 2002) (citation and internal quotation marks omitted).  Instead,

> due process protections apply only if a plaintiff is subjected to stigma plus; *i.e.,* if the [government] makes a charge against [a plaintiff] that might seriously damage his standing and associations in the community, and 1) the accuracy of the charge is contested, 2) there is some public disclosure of the charge, and 3) it is made in connection with the termination of employment or the alteration of some right or status recognized by state law.

*Id.* (citation and quotation signals omitted).

"[T]he liberty interests protected by the Fourteenth Amendment are implicated only when the government's stigmatizing statements effectively exclude the employee completely from her chosen profession."  *Blantz v. Calif. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 925 (9th Cir. 2013).  Stigmatizing statements that merely cause "reduced economic returns and diminished prestige, but not permanent exclusion from, or protracted interruption of, gainful employment within the trade or profession" do not constitute a deprivation of liberty.  *Id.* (citing *Stretten v. Wadsworth Veterans Hosp.,* 537 F.2d 361, 366 (9th Cir.1976), and *Roth v. Veteran's Admin.,* 856 F.2d

1401, 1411 (9th Cir.1988), *overruled on other grounds by Garcetti v. Ceballos,*
547 U.S. 410 (2006)).

   The County is correct that Plaintiff has not alleged that the
stigmatizing statements have effectively excluded him from his chosen profession.
*Blantz*, 727 F.3d at 925.  At best, Plaintiff has alleged that the County stated to the
press that he was terminated for "renegade" actions and that he made unsanctioned
comments on behalf of the OPA.  Plaintiff does not allege that he has been unable
to find work in his chosen profession as a lawyer.  Indeed, public records of which
this court can take judicial notice indicate that Plaintiff has continued to represent
clients in court after his termination.  *See, e.g.*, Hawaii State Judiciary e-Court
\*Kokua, https://www.courts.state.hi.us/legal_references/records/jims_system_
availability (select "Party Search," enter last name "Christensen," first name
"Robert") (last visited October 16, 2024); PACER Case Locator,
http://pacer.psc.uscourts.gov (indicating three cases with Plaintiff serving as
counsel) (last visited October 16, 2024).

   Plaintiff has not plausibly alleged a stigma-plus due process claim.
The County and Like's motion is GRANTED.  And, given that Plaintiff has
apparently continued to work as a lawyer, he has not been "effectively exclude[d]"
from his chosen profession.  *Blantz*, 727 F.3d at 925.  Plaintiff had an opportunity

to address the County's allegation that he resumed practicing law "less than six months after his termination," ECF No. 72-1 at PageID.381, in his Opposition, but he did not.  The court concludes that amendment would be futile.  Leave to amend is DENIED.

### 3.    *Plaintiff's HWPA Claim Fails Against Like*

Like argued in her substantive joinder that any HWPA claim should be dismissed as to her because HWPA claims cannot be brought against an individual.  The court agrees.

The Hawaii Supreme Court has not specifically addressed whether an HWPA claim can be brought against an individual, but it has held that the Hawaii statutes governing harassment and retaliation (HRS §§ 378-2(1)(A) and 378-2(2)) do not impose liability on individual employees.  *See Lales v. Wholesale Motors Co.*, 133 Haw. 332, 343, 328 P.3d 341, 352 (2014).  This ruling was based on the definition of "employer" in HRS § 378-1 as "any person, including the State or any of its political subdivisions and any agent of such person, having one or more employees, but shall not include the United States."  133 Haw. at 344, 328 P.3d at 353.

In examining whether an HWPA claim can be made against an individual, courts in this district—including this one—have determined that

27

because the definition of "employer" in the HWPA (HRS § 378-61) is the same as the definition in HRS § 378-1, HWPA claims must be treated in the same manner as harassment and retaliation claims—that is, an HWPA claim cannot be brought against an individual. *See Estacion v. Kaumana Drive Partners, LLC*, 2019 WL 5295183, at *4 (D. Oct. 18, 2019); *Onodera v. Kuhio Motors Inc.*, 2014 WL 1031039, at *7–*8 (D. Haw. Mar. 13, 2014) (citing *Lales*, 133 Haw. at 345, 328 P.3d at 354); *Casumpang v. Hawaiian Com. & Sugar Co.*, 2014 WL 4322168, at *18 n.13 (D. Haw. Aug. 29, 2014) (citing *Onodera*, 2014 WL 4322168, at *7–*8); *Ritchie v. Hawaiʻi*, 2014 WL 4905336, at *8 (D. Haw. Sept. 30, 2014) (citing *Onodera*, 2014 WL 4322168, at *7–*8).

Accordingly, Plaintiff's HWPA claim is DISMISSED as to Like.

## C. Motions for Partial Judgment on the Pleadings as to Plaintiff's First Amendment Retaliation Claim (ECF Nos. 73 & 75)

Plaintiff alleges that his "action in speaking out against a judicial nominee constituted speech on a matter of public concern and as such, was protected by the First Amendment to the U.S. Constitution." ECF No. 17 at PageID.123. He further alleges that "Defendants wrongfully terminated [his] employment because of his public pronouncements." *Id.*

The County, joined by Like, seeks to dismiss this claim on two bases. First, that Plaintiff did not sufficiently allege what speech he claims is protected by

28

the First Amendment, and therefore it is not clear that he spoke on a matter of public concern.  ECF No. 73-1 at PageID.418–420.  Second, that Plaintiff spoke as a public employee, not a private citizen, and that his speech therefore falls outside the protections of the First Amendment.[13]  ECF No. 73-1 at PageID.420–436.  In addition to joining the County's arguments, Like argues that the First Amendment retaliation claim should be dismissed as to her because as a government official, she has qualified immunity.

As set forth below, the court determines that Plaintiff has alleged a plausible First Amendment retaliation claim against the County, but Plaintiff's claim must be dismissed as to Like because she has qualified immunity.

1.   *Plaintiff Has Alleged a Plausible First Amendment Retaliation Claim*

a.   *Legal Framework*

First Amendment retaliation claims are analyzed under the five-factor inquiry described in *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  Relevant here, Plaintiff must show that (1) he spoke on a matter of public concern; (2) he spoke as a private citizen rather than a public employee; and (3) the relevant speech was a substantial or motivating factor in the adverse employment action.

---

[13]  Plaintiff conceded at the hearing that he was not claiming that his investigation of Suspect's Counsel or his work preparing a police report against Suspect's Counsel are protected speech.

*Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1259 (9th Cir. 2016) (citing *Eng*, 552 F.3d at 1070–71). "If [Plaintiff] establishes [] a prima facie case, the burden shifts to the government to demonstrate that (4) it had an adequate justification for treating [him] differently than other members of the general public; or (5) it would have taken the adverse employment action even absent the protected speech." *Barone v. City of Springfield, Oregon*, 902 F.3d 1091, 1098 (9th Cir. 2018) (citing *Coomes*). "[F]ailure to meet any [factor] is fatal to the plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (en banc).

        The Supreme Court has held that "so long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti v. Ceballos,* 547 U.S. 410, 419 (2006). Accordingly, the First Amendment protects some expressions related to a public employee's work. *Id.* at 421–22. The fact that a communication concerns the subject matter of the public employee's work is not dispositive. *Id.* at 420. In fact, public employees of a particular class may have more "informed and definite opinions" than the general public, so "it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Id.* at 421. The key question is whether the

speech was made "pursuant to [an employee's] official duties." *Id.* at 421.  This

inquiry concerns particularly "whether the speech at issue is itself ordinarily within

the scope of an employee's duties, not whether it merely concerns those duties."

*Lane v. Franks*, 573 U.S. 228, 240 (2014).

> *Dahlia* established a three-factor test to determine whether an

individual is speaking as a public employee or a private citizen.  735 F.3d at 1074.

First, when a public employee communicates with individuals or entities outside of

his chain of command, it is unlikely that he is speaking pursuant to his duties.  *Id.*

> Second,

> > the subject matter of the communication is also of course
> > highly relevant . . . . When an employee prepares a
> > routine report, pursuant to normal departmental
> > procedure, about a particular incident or occurrence, the
> > employee's preparation of that report is typically within
> > his job duties. . . .  By contrast, if a public employee
> > raises within the department broad concerns about
> > corruption or systemic abuse, it is unlikely that such
> > complaints can reasonably be classified as being within
> > the job duties of an average public employee, except
> > when the employee's regular job duties involve
> > investigating such conduct, e.g., when the employee
> > works for Internal Affairs or another such watchdog unit.

*Id.* at 1074–75.

> Third,

> > when a public employee speaks in direct contravention to
> > his supervisor's orders, that speech may often fall outside

31

> of the speaker's professional duties.  Indeed, the fact that
> an employee is threatened or harassed by his superiors
> for engaging in a particular type of speech provides
> strong evidence that the act of speech was not, as a
> "practical" matter, within the employee's job duties
> notwithstanding any suggestions to the contrary in the
> employee's formal job description.

*Id.* at 1075.  Whether an individual speaks as a public employee is a mixed

question of fact and law.  *Barone*, 902 F.3d at 1099.  "First, a factual determination

must be made as to the 'scope and content of a plaintiff's job responsibilities.'"  *Id.*

(citing *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011).

"Second, the 'ultimate constitutional significance' of those facts must be

determined as a matter of law."  *Id.* (citing *Johnson*, 658 F.3d at 966).

> b.   *Discussion*

> i.   Factor (1): Plaintiff has alleged protected speech

The first *Eng* factor is met—Plaintiff alleged that he spoke on a matter

of public concern.  *Coomes*, 816 F.3d at 1259.  Plaintiff conveyed information to

the Chief Justice of the Hawaii Supreme Court, the Hawaii State Senate, and to the

HSBA that Suspect's Counsel should not be selected as a judge because there was

an ongoing investigation against him for witness tampering.  Whether an

individual is of good character to become a judge is an obvious matter of public

concern.

32

          ii.      Factor (2): Plaintiff spoke as a private citizen, not an employee

To determine whether Plaintiff spoke as a private citizen or as an employee of OPA, this court applies the three factors laid out in *Dahlia*, 735 F.3d at 1074–76.

The first *Dahlia* factor asks whether the employee's speech was to individuals within his chain of command—"[w]hen a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties." *Id.* at 1074. This factor weighs in Plaintiff's favor:  None of the governing bodies he spoke to is within his chain of command. Although Plaintiff notified those within his chain of command that he was making the comments, his actual communications were made to individuals outside his chain of command.

The second factor, the subject matter of the communication, also weighs in Plaintiff's favor. *Id.* at 1074–75. His communications were not made as a matter of routine. There was no internal OPA policy requiring him to speak. Although Plaintiff arguably had a professional obligation to raise the issue of Suspect's Counsel's lack of character under the Hawaii Rules of Professional

Conduct, that obligation derived from his membership with the Hawaii State Bar, not his employment at OPA.[14]

The third *Dahlia* factor concerns whether the public employee's superiors condoned his speech. *Id.* at 1075. This factor also weighs in Plaintiff's favor. Plaintiff alleges that he submitted testimony against the nomination of suspect's counsel "in his own capacity"; his speech was not made as part of any duty he was paid to perform or in the course of his official duties. ECF No. 17 at PageID.112; *see also Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1071 (9th Cir. 2012) (A public employee's speech on a matter of public concern is protected "if the speaker 'had no official duty' to make the questioned statements, . . . or if the speech was not the product of 'perform[ing] the tasks [the employee] was paid to perform.'") (quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)).

Plaintiff alleges that though his supervisors were initially supportive, they never told him to make the communications in question, nor indicated that these communications were within his job duties. His exchanges with both Siu and Like indicate that they understood Plaintiff to be fulfilling an ethical obligation as

---

[14] For example, Hawaii Rule of Professional Conduct 8.3(a) requires a lawyer "who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, [to] inform the appropriate professional authority."

an individual rather than completing a work-related duty.  When Plaintiff spoke to Siu about the ODC complaint and his intent to testify, Siu told Plaintiff "not to do it for me," and Plaintiff responded that he was "doing it for everyone."  *Id.* at PageID.109.  Plaintiff then "specifically told Siu that he did not need his permission."  ECF No. 17 at PageID.109.  And when Plaintiff informed Like of his plan, she told Plaintiff that he was "doing the right thing" and offered her full support.  *Id.* at PageID.113.  The fact that Like had to make her supportive stance clear—and her reference to the "right thing," i.e., an ethical obligation—both indicate that Plaintiff's testimony against Suspect's Counsel was not part of his job duties.

There is also no indication that Plaintiff acted pursuant to his supervisors' orders when he made his communications and testimony.  He provided a copy of his interview with the complaining witness to the HSBA Board, apparently without asking his superiors and obtaining authorization.  *Id.* at PageID.110.  And he took personal leave to testify at the HSBA board and Senate, which Siu approved.  *Id.* at PageID.110–111.

Furthermore, both DPA Siu and Like explicitly distanced themselves from Plaintiff's comments.  Siu said he wanted nothing to do with the matter because "it would come back on him."  *Id.* at PageID.111–112.  And although

35

initially supportive, Like changed her stance and decided that her office would not take an official position because Suspect's Counsel would be "confirmed anyway." *Id.* at PageID.114.  She said that she was uncomfortable with opposing the confirmation, and that she never backed the ODC Complaint.  *Id.* at PageID.114– 115.  Ultimately, she terminated Plaintiff after initiating an investigation into his efforts to secure permission to testify.  *Id.* at PageID.116, 120.  This all indicates that the third *Dahlia* factor weighs in Plaintiff's favor—his supervisors did not condone his speech and he ultimately suffered retaliation.

       In its argument that Plaintiff was speaking as a public employee, the County relies on *Brandon v. Maricopa County*, 849 F.3d 837 (9th Cir. 2017).  In that case, Brandon—a civil litigation attorney for Maricopa County—received a call from a journalist inquiring about a case she was handling, and gave a comment that was later published.  *Id.* at 839.  Maricopa County officials disapproved and terminated her.  *Id.* at 839–40.  In holding that Brandon spoke as a public employee, the Ninth Circuit reasoned that although "Brandon was not speaking within her chain of command she was speaking as a lawyer representing the county as her public statements touched on the very matter on which she represented the county."  *Id.* at 845.  Here, the County argues that like Brandon, Plaintiff's

comments were intertwined with his duty of representation of his client, the County.  ECF No. 73-1 at PageID.424–425.

*Brandon* is distinguishable.  Brandon was responding to a media inquiry within the workplace—that is, the reporter initiated the communication, not she.  849 F.3d at 840.  Here, Plaintiff himself reached out to the HSBA, the Chief Justice, and the Senate on his own initiative to provide public comment on a judicial nominee.  And, whereas Brandon was commenting in response to a direct inquiry into the activities of her employer, Plaintiff was commenting on a confirmation proceeding occurring entirely outside of and independent from his office.  Thus, unlike in *Brandon*, Plaintiff's speech was not within the scope of his duties as an attorney representing the County.

       iii.    Factor (3): Plaintiff's speech was a substantial or motivating factor in his termination

The County does not dispute the third *Eng* factor.  Shortly before termination, Like indicated to Plaintiff that he was being investigated for his efforts to seek input and approval for his testimony to the Senate Judiciary Committee and ODC.  ECF No. 17 at PageID.116.  Plaintiff has made a plausible claim that his later termination was a direct result of his speech.

Given that Plaintiff has plausibly alleged a claim of First Amendment retaliation, the County's Rule 12(c) motion is DENIED.

37

###### 2.   *Like Has Qualified Immunity*

####### a.   *Law*

Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  A government official is shielded from liability under 42 U.S.C. § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *David v. Betts*, – F. Supp. 3d –, 2024 WL 2214613, at *14 (D. Haw. May 15, 2024) (quoting *Rieman v. Vazquez*, 96 F.4th 1085, 1092 (9th Cir. 2024) (internal quotation marks omitted)).  To make that determination, courts "consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Id.* (quoting *Rieman*, 96 F.4th at 1092) (internal quotation marks omitted).  If the answer to either question is no, then the official has qualified immunity.  *Id.*

Courts have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "A clearly established constitutional right 'must be particularized to the facts of the case.'" *David*, 2024 WL 2214613, at *14 (quoting *Rieman*, 96 F.4th at 1092).  And

"[b]ecause the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Rieman*, 96 F.4th at 1092) (internal quotation marks omitted).

"[C]learly established law cannot be defined at . . . a 'high level of generality.'" *Scott v. Smith*, 109 F.4th 1215, 1229 (9th Cir. 2024) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). Instead, "[f]or a right to be clearly established, case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). The court must either find "cases of controlling authority or a consensus of cases of persuasive authority on the constitutional question," or that "the constitutional right at issue is defined by a standard that is so obvious that we must conclude that qualified immunity is inapplicable, even without a case directly on point." *Jessop v. City of Fresno*, 936 F.3d 937, 942 (9th Cir. 2019) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999), and *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 455 (9th Cir. 2013)) (internal quotation marks and alterations omitted); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (explaining that a statement of the law at a high level of generality

may "clearly establish" a right in an obvious case, but a complex case requires a more particularized delineation of the right's contours).

>           b.      Discussion

>                Here, there is no clearly established case law applicable to the situation Like faced.  Although case law supports a conclusion that Plaintiff spoke as a private citizen, not a public employee (as explained in the previous section) no case law would have "ma[de] it *obvious*" to Like that Plaintiff was not speaking as a public employee (and thus, that terminating Plaintiff violates federal law). *Shafer,* 868 F.3d at 1117 (emphasis added).  There is no published opinion that particularly addresses a situation where a prosecutor files a disciplinary complaint in connection with one of his cases, or where he uses official letterhead on his own initiative to provide testimony in a judicial confirmation proceeding.  As the County argues, *Brandon*, construed broadly, held that an attorney acting within the scope of his representation of the County speaks as a public employee.  849 F.3d at 845.  Given these indicia (the ODC complaint and the use of County letterhead), and this reasoning from *Brandon*, Like might have believed that Plaintiff was acting as a public employee, and might thus have—reasonably, if mistakenly— believed that his termination did not violate his rights.  *See Ashcroft*, 563 U.S. at

743 (reiterating that qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions").

And, this is not "one of the rare cases" where the right in question is so "clearly established" that the violation was "obvious" and no case on point is needed. *Jessop*, 936 F.3d at 942.  Although the First Amendment right to speech is clearly-established, the right to speech about matters encountered in the course of public employment is not clear—it has been the subject of voluminous caselaw, and depends to some extent on a factfinder's determination of the scope of the plaintiff's duties.

In sum, Like could have reasonably believed that Plaintiff was speaking as a public employee when he spoke out about judicial nominee's impropriety by filing the ODC complaint and by using OPA letterhead, and therefore that his speech was not protected by the First Amendment.  Because there is no violation of a "clearly established" right, Like has qualified immunity. Plaintiff's First Amendment retaliation claim is DISMISSED as to Like.

## V.  CONCLUSION

For the reasons stated above, the court:

(1)    GRANTS judgment on the pleadings and dismisses Plaintiff's IIED claim as to the County, but DENIES dismissal of the same as to Like;

41

(2)     GRANTS judgment on the pleadings and dismisses all of Plaintiff's due process claims as to both Defendants, and further GRANTS dismissal of Plaintiff's HWPA claim as to Like;

(3)     DENIES judgment on the pleadings as to Plaintiff's First Amendment retaliation claim as to the County, but, determining that Like has qualified immunity, GRANTS dismissal of the retaliation claim as to Like.

To be clear, the following claims remain in the case:

(1)     Count I, First Amendment retaliation claim as to the County only;

(2)     Count II, HWPA claim as to the County only;

(3)     Count II, Wrongful Termination (*Parnar*) claim as to the County and Like;

(4)     Count IV, Defamation as to the County and Like;

(5)     Count V, IIED as to Like only.

///

///

///

///

///

///

42

Plaintiff may file a Third Amended Complaint if he believes that he can allege post-termination conduct that satisfies the IIED standard by November 8, 2024.  A Third Amended Complaint cannot add new claims or supplement existing ones, other than as permitted by this Order.  Failure to amend by that date will result in the action proceeding only as to the claims that currently remain in the SAC, as identified above.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 18, 2024.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Christensen v. County of Kauai et al.*, Civ. No. 23-00001 JMS-KJM Order Granting in Part and Denying in Part the County of Kauai's Motions for Partial Judgment on the Pleadings, ECF Nos. 71, 72, 73, and Rebecca Vogt-Like's Substantive Joinders, ECF Nos. 74, 75, 76